WESTINGHOUSE ELECTRIC & MANUFACTURING CO. *v.* HUPP.

1. BILLS AND NOTES—EXTENSION OF TIME OF PAYMENT—RELEASE OF INDORSERS.

An agreement by the creditor with the principal debtor which extends the time of payment of the debt without the consent of the surety or indorser secondarily liable discharges the latter.

2. SAME.

Where a corporation gave to plaintiff certain notes indorsed by its president and secretary, an agreement to extend the

On reservation of rights against party secondarily liable upon a bill or note upon granting extension of time to party primarily liable, as preventing discharge of former, see note in 46 L. R. A. (N. S.) 92.

time of payment upon condition that plaintiff retain the notes as collateral, which was assented to by the president who undertook to also speak for the secretary, the latter in the meantime having ceased to be an officer of the corporation and having no knowledge of the arrangement, operated to release him from liability as an indorser.

Error to Wayne; Mandell (Henry A.), J. Submitted June 16, 1920. (Docket No. 45.) Decided September 30, 1920.

Assumpsit by the Westinghouse Electric & Manufacturing Company against Robert C. Hupp and Louis G. Hupp on certain promissory notes. Plaintiff later assigned its claim against Robert C. Hupp. Judgment for defendant. Plaintiff brings error. Affirmed.

*Millis, Griffin, Seely & Streeter* (*George B. Murphy,* of counsel), for appellant.

*Stevenson, Carpenter, Butzel & Backus* (*William S. McDowell,* of counsel), for appellee.

STEERE, J. This action was begun in the Wayne county circuit court on December 23, 1914, to recover from defendants a balance due on the following promissory notes:

"$5,939.83                    Detroit, Mich., June 17, 1912
"Three months (3) after date we promise to pay to Westinghouse Electric and Manufacturing Co. or order Fifty-nine Hundred Thirty-nine and 83/100 Dollars, at Old Detroit National Bank, Detroit, Mich., value received with 6 per cent. interest per annum.
"No. 876.    Due Sept. 17, 1912.
                    "R. C. H. CORPORATION.
                    "B. Q. HAZLEWOOD, Vice-President.
"September 17, 1912. Detroit, Michigan. Protested for non-payment.
"W. E. WINKLER, Notary Public.

(Indorsements on back of note.)
               "R. C. HUPP,
               "L. G. HUPP, ·
"Pay to the order of Old Detroit Nat'l Bank
               "Detroit, Mich.
      "WESTINGHOUSE ELECTRIC & MANUFACTURING CO.,
               "T. W. SIEMON, Treasurer.
                    "Credit.
"Sept. 18—12.              $5,000.00 c/o principal.
          "Int. to Sept. 17/12, $91.07
"Without recourse.
      "FIRST AND OLD DETROIT NATIONAL BANK,
      "By BYRON W. CLUTE, Asst. Cashier."

"$6,000.00              Detroit, Mich., June 17, 1912.
   "Three months (3) after date we promise to pay
to Westinghouse Electric & Manufacturing Co., or or-
der Six Thousand and no/100 dollars at First National
Bank, Detroit, Mich., value received with six per cent.
interest per annum.
      "No. 875.   Due Sept. 17, 1912.
                         "R. C. H. CORPORATION,
                         "B. Q. HAZLEWOOD.
   (Written across face of note)—"Protested Sept.
17th, 1912.   Frank Temple."
   (Back of note indorsements.)
               "R. C. HUPP,
               "L. G. HUPP,
"Pay to the order of First National Bank, Detroit,
   Mich.,
"WESTINGHOUSE ELECTRIC & MANUF'G CO., T. W. SIE-
   MON, Treasurer.
"Int. pd. Sept. 18/12 to Sept. 17/12, $92.00 Without re-
   course,
               "FIRST AND OLD DETROIT NAT'L BANK,
               "By BYRON W. CLUTE, Asst. Cashier."

   The evidence introduced is mostly documentary,
that which is oral being devoted mainly to identifica-
tion and amplification of correspondence between the
parties.   The only issue pressed for determination at
the trial was whether defendant Louis G. Hupp re-
mained liable as an indorser on said notes, from which
he claimed release by reason of plaintiff having

granted extension of time for payment to the principal debtor without his knowledge or consent and since commencement of this action has released Robert C. Hupp, his co-indorser, from liability to it by selling and assigning its right of action against said Robert C. to the latter's wife.

The trial court in due time filed findings of fact and conclusions of law sustaining defendant's contention that he had been released by extension of time of payment, and entered judgment in his favor. Plaintiff's right of review was preserved by proper objections, motions and exceptions.

These notes were given by the "R. C. H. Corporation," an automobile manufacturing concern located in Detroit, for supplies and equipment in its line purchased from the plaintiff Westinghouse Electric & Manufacturing Company of Pittsburg, Pa. When the notes were given and dishonored the Hupp brothers, who indorsed them, were stockholders and officers of the R. C. H. Corporation, Robert C. Hupp being its president and Louis G. Hupp its secretary and treasurer. Shortly before the notes fell due plaintiff indorsed and sent them for collection to the First National Bank of Detroit. They were dishonored when presented for payment on the day they fell due and promptly protested with proper notice to the two indorsers, who were yet stockholders and officers of the maker of the notes.

About the time the notes fell due and while they were yet in the hands of the Detroit bank, the R. C. H. Corporation sent plaintiff $5,000 and interest on both notes to and including the date they fell due with a renewal note to cover the balance owing on said notes. Plaintiff's then treasurer and secretary testified that the $5,000 was credited on the note for $5,939.83, and interest to September 18, 1912, was credited on both notes, but said:

"I do not know what became of the renewal note; it was never accepted by us as a renewal, and the last I knew of the note it was in the possession of the Westinghouse company."

There is no evidence it was ever returned, and defendant Louis G. Hupp who, as secretary and treasurer of the maker, sent the remittance and renewal note to plaintiff, testified:

"The renewal note was never returned to me or to the R. C. Hupp Corporation prior to the time that I left the corporation, November 1, 1912."

At the time the notes were dishonored the R. C. H. Corporation was financially embarrassed and not long thereafter creditors became solicitous over its condition, resulting in a certain committee acting with its officers taking steps to effect some adjustment of its difficulties. A form of proposed agreement dated October 25, 1912, between its creditors and the corporation was prepared, by which it was provided that the agreeing creditor would extend the time of any indebtedness owing him, or it, by the corporation, however evidenced, until May 4, 1914, in consideration of which a controlling amount of stock in the corporation should be transferred to named trustees, with right to vote the same as owners until payment of its debts, resignation of the present directors would be tendered in writing, new directors be elected and other steps taken under changed control and management to effect liquidation of its indebtedness. A copy of this agreement with a circular letter of explanation to creditors and request to execute the agreement was sent plaintiff on November 1, 1912, which was answered by its secretary November 8, 1912, expressing a desire to co-operate, but saying in part:

"The major portion of our claim, however, is represented by notes of the corporation, indorsed by R. C. and L. G. Hupp. We feel, if it is possible to do so

legally, we are entitled to whatever value this indorsement may have, either now or in the future, and we wish to inquire whether your committee has the authority, and will agree that if we accept the plan of the committee, we may hold our indorsed notes as collateral."

The letter then describes the notes and payment of $5,000 with interest, and says:

"No payments have been made except the above for $5,000, which has been credited account principal. The R. C. H. Corporation have offered us their note for $6,939.83, in renewal of the balance due us, which we have declined, but which is still in our possession."

This was answered November 11, 1912, by R. C. Hupp, who signed as president, saying in part:

"The writer wishes to say on his own behalf, and also on behalf of Mr. L. G. Hupp, notes held indorsed by us you may continue to hold as collateral."

Other letters were exchanged, resulting finally in the proposed agreement for extension of time, dated October 25th, being executed in behalf of plaintiff by T. W. Siemon, its treasurer, and for the R. C. H. Corporation by J. H. Hartz, its treasurer and general manager, containing, however, the following provision:

"With the right reserved to the W. E. & M. Co. to hold notes indorsed by R. C. and L. G. Hupp and now in the possession of the W. E. & M. Co. as collateral security to any note or notes taken under this agreement."

In a letter dated November 21, 1912, returning the signed agreement to the R. C. H. Corporation, plaintiff calls attention to this provision, saying: "This is in accordance with your note of November 11th." This was acknowledged by letter of November 25th, recognizing as "entirely satisfactory" the provision quoted. Of this the trial court said, and found in fact:

"Mr. L. G. Hupp has testified that after resigning from any position that he held with the corporation he knew nothing of this correspondence; knew nothing of the indorsement made by the plaintiff on the agreement that it entered into with the Hupp Corporation concerning the notes being held as collateral, and knew nothing of the undertaking made by his brother in his behalf that the notes might be held as collateral, and he has stated positively under oath that he gave his brother no authority to make such statement in his behalf, and that he believed, and had reason to believe, that all liability on the notes on his part was at an end during the early part of November, 1912. His statements with regard to these facts are uncontradicted. They appear to be logical and truthful, and must be accepted as established facts in the case."

After exchange of executed copies for extension of time the R. C. H. Corporation paid plaintiff interest on the unpaid balance of the two notes until June 25, 1913. It thereafter became hopelessly insolvent, went out of business and liquidated. Plaintiff received no money from the liquidation.

On December 23, 1914, this action was begun by plaintiff against the two defendants, who appeared and separately pleaded the general issue. Louis G. also gave notice of special defenses, which included discharge by extension of time granted the maker without his knowledge or consent.

While the action was pending plaintiff, on July 10, 1918, assigned all its right, title and interest in the claim declared upon against Robert C. Hupp to his wife, Elsie E. Hupp, for an expressed consideration of $1,000, with the hyperbolic assurance in the instrument of transfer that such claim so transferred represented all claims of every name and nature it had "in connection with the aforementioned liability, or may have against the said Robert C. Hupp from the beginning of the world to the day of the date of these pres-

ents," making it equally clear that his brother, Louis
G., was, so far as plaintiff could provide, retained to
tread the wine-press alone in this action which plain-
tiff expressly reserved the right to proceed with
against him "for the principal sum of said indebted-
ness, together with accrued interest less one thousand
dollars ($1,000), the consideration recited in this in-
strument," etc.

Upon the trial a jury was impanelled, but after
proofs were closed both sides moved for a directed
verdict and by consent of parties the jury was excused.
The case was then argued and submitted, taken under
advisement by the court and an opinion subsequently
filed with findings granting defendants' motion, fol-
lowed by entry of judgment in form as on directed
verdict.

Plaintiff moved to set aside the directed verdict and
for judgment *non obstante,* which was denied, and has
removed the case to this court for review on numerous
assignments of error which in their essence, and as
argued, center against the three grounds urged for
defendant before the trial court, concisely stated in its
opinion as follows:

"*First,* that the time on the original notes has been
extended without his consent; *second,* that the plain-
tiff had released the prior indorser, R. C. Hupp; and
*third,* that the plaintiff accepted the renewal note as
tendered with the $5,000 check, on September 17, 1912,
and has ever since retained the same, and in its letter
of November 8, 1912, expresses an intention to retain
said renewal note."

Because the agreement entered into with the maker
of the two notes extended the credit for a definite
period of approximately 18 months without the con-
sent of indorser, Louis G. Hupp, only reserving the
indorsed notes "as collateral security to any note or
notes taken under this agreement," the trial court held

upon the first ground as a conclusion of law under the undisputed facts that the reservation claimed was not such that had Louis G. Hupp paid the notes "he could immediately recover the same from the maker," and by the shown postponement made without his consent he was released as an indorser.

As a result of the creditors' agreement for reorganization Louis G. Hupp was succeeded by a new secretary and left the corporation on November 1st. Up to that time plaintiff had not returned the renewal note nor advised the corporation it was not acceptable, nor even, so far as shown, acknowledged receipt of the remittance sent with it. Not until November 8th, in reply to the letter relative to an agreement by creditors, did plaintiff state its position, telling how the remittance had been applied, and that it "declined" the renewal note for the balance, which it had received and retained and yet keeps possession of so far as shown here. This note was for $6,939.83. The corporation paid plaintiff interest on that amount until June 25, 1913. Plaintiff did not produce nor offer any explanation of what became of that renewal note. R. C. Hupp was president of the corporation, named from his initials, and held a very large interest in it. He was president when he wrote the letter of November 11, 1912, in which he wished "to say in his own behalf and also on behalf of Mr. L. G. Hupp, the notes held, indorsed by us, you may continue to hold as collateral." L. G. Hupp, who had but a small interest in the corporation, had then been succeeded by another secretary and was no longer connected with the concern. His denial that he wished to say, or said, or then knew his brother had said for him that the notes with his indorsement on them could be held as collateral, is positive and undisputed.

The bill to make uniform the law of negotiable instruments recommended by the commissioners on uni-

form State laws in their national conference has been adopted by Pennsylvania and Michigan as well as most other States. It is largely a codification of the generally prevailing law upon the subject as settled by legislation and interpretation, the controlling purpose being uniformity with as few changes in the various jurisdictions as were necessary to accomplish that purpose. It may be noted the act has changed the previous rule in this State as to an indorser before delivery which held him to be a joint maker. It was adopted here by Act No. 265, Pub. Acts 1905, being chapter 119, 2 Comp. Laws 1915. Said act provides in part as follows:

"SECTION 6041. The person 'primarily' liable on an instrument is the person who by the terms of the instrument is absolutely required to pay the same. All other parties are 'secondarily' liable."

"SEC. 6105. Where a person not otherwise a party to an instrument, places thereon his signature in blank before delivery, he is liable as indorser in accordance with the following rules:
"*First.* If the instrument is payable to the order of a third person, he is liable to the payee and to all subsequent parties;"  *  *  *

"SEC. 6109. As respects one another, indorsers are liable *prima facie* in the order in which they indorse; but evidence is admissible to show that as between or among themselves they have agreed otherwise. Joint payees or joint indorsees who indorse are deemed to indorse jointly and severally."

"SEC. 6161. A person secondarily liable on the instrument is discharged:  *  *  *
"*Third.* By the discharge of a prior party.  *  *  *.
"*Sixth.* By any agreement binding upon the holder to extend the time of payment, or to postpone the holder's right to enforce the instrument, unless made with the assent of the party secondarily liable, or unless the right of recourse against such party is expressly reserved."

It is undisputed that by the terms of those notes the
R. C. Hupp Corporation as maker was absolutely re-
quired to pay the same, and primarily liable. The
Hupp brothers placed their signatures in blank on the
back of the instruments before delivery. They were
not otherwise parties to them, and were casual in-
dorsers secondarily liable. The order in which they
indorsed not only appears on the back of the notes but
it was shown in fact without dispute that Robert C.
first indorsed them, after which they were taken into
where Louis G. was for his signature. While notice
and protest for non-payment fixed their secondary lia-
bility it did not change the relative positions of maker,
indorsers or payee, or of the indorsers as respects one
another. With the plain language prescribing, we see
no occasion to theorize on those propositions.

When plaintiff received and credited the payments
of September 18th, and retained the new note accom-
panying the remittance asking extension of time for
the balance, without indicating disapproval until a
further extension of time for 18 months was asked,
and then first "declined" it but kept the note, it is not
a far-fetched assumption from its conduct that it at
that time assented to the proposition for extension of
time on the balance and the belated declination when
new conditions arose was an afterthought. But as
plaintiff's then secretary and treasurer testified it was
not, and the uncommunicated intent not to accept the
unreturned renewal note was entertained from the
time of its receipt, that proposition may be passed as
inconclusive.

The sixth provision of section 6161 is but the statu-
tory adoption of a well-settled rule relative to the
rights of indorsers of negotiable instruments with a
generally recognized exception to such rule. It has
long been the general rule that an agreement by the
creditor with the principal debtor which extends the

time of payment of the debt without the consent of the surety, or indorser secondarily liable, discharges the latter. That there was between the corporation which made these notes and plaintiff, the payee and holder, a lengthy and elaborate agreement in writing by which their time of payment was extended for approximately a year and a half, is undisputed. R. C. Hupp, the first indorser, consented to this agreement. L. G. Hupp, the second indorser, did not. Both were made defendants in this action. Through the kind offices of his wife and a thousand dollars, R. C. Hupp, who had renewed his obligation in writing, was dropped from this litigation and relieved of all liability to the full amount of this paper, so far as plaintiff was concerned, "from the beginning of the world." "In the order in which they indorsed" he was prior to his brother, and, "as respects one another," in such order *prima facie* liable. There is no evidence that they agreed otherwise between themselves and Louis G. denies that such was the case. But the question of successive liability of the indorsers was not passed upon by the trial court and need not be determined here.

The question of controlling importance is whether plaintiff, under the concluding provision of subdivision 6, section 6161, "expressly reserved" against defendant Louis G. Hupp "right of recourse" when extending time of payment by agreement with the R. C. H. Corporation and postponing its right to enforce the notes against it upon which he was secondarily liable. This exception to the rule of release by an agreement between the principal debtor and the holder of the paper in which right of recourse is reserved against the indorser, or party secondarily liable, is but an embodiment in the statute in concise words of a well-recognized common-law rule, which has, however, been the subject of much discussion and con-

troversy in the past. It is now statute law in this State, and need not be reviewed beyond its application here. Abundant discussion of the subject can be found in the text-books on negotiable instruments and cases cited in footnotes under *Meredith* v. *Dibrell,* 46 L. R. A. (N. S.) 92 (127 Tenn. 387, 155 S. W. 163, Ann. Cas. 1914B, 1079). In the *Meredith Case* itself it was found that the right of recourse was expressly reserved against the indorser and held that notice of such reservation was not necessary when extending time of payment to the maker.

Before adoption of the present negotiable instrument act this court has on occasion noted and recognized the common-law exception that a surety is not released by extension of time where right of immediate recourse against him is expressly reserved by the creditor. *Bailey* v. *Gould,* Walk. Ch. 482; *Big Rapids Nat. Bank* v. *Peters,* 120 Mich. 518. Counsel for plaintiff cite and apparently rely on the latter case as of controlling significance. While in that case the question of extension of time with reservation of recourse was involved, as here, the law was not in dispute but its application to the facts, and the case turned on whether or not the bank as a matter of fact did extend time and reserve its immediate right of action against the sureties, which the trial court submitted to the jury, while defendant insisted a verdict should have been directed in its behalf. This court in reviewing the case said:

"We cannot agree with counsel that there was no testimony tending to show such reservation. * * * We think the verdict was not so at variance with the weight of the evidence as to make a refusal to grant a new trial erroneous,"

and declined to disturb the finding of court and jury that there never was any definite extension of time or

waiver of right to proceed forthwith against the sureties.

Here there was an unquestioned extension of time for 18 months without notice to the surety, and the claimed reservation of right of recourse held the old notes as collateral to that extension. Clearly no "right of recourse" before expiration of that time is expressly reserved *in hæc verba*, and it is as fairly inferable from the correspondence and language of the agreement that the intention was to suspend the right of recourse during the 18 months as to reserve it. Plaintiff was willing to grant the 18 months extension. All it apparently desired was to strengthen the security on that extension by the indorsements on the old notes. It had the assurance of the president of the R. C. H. Corporation that the indorsers, he being one, consented to the extension. It may be inferred that on the mistaken assumption both indorsers consented plaintiff inserted in the agreement its right to hold the notes as collateral to any notes taken under the agreement for extension as it was led to believe all had agreed to such reservation and postponement of the right of recourse, which would be valid if they had all consented. Appropriate wording was used to that end. It ran with the principal promise of the R. C. H. Corporation to pay the indebtedness at the expiration of 18 months, as additional security for its performance. "Collateral security" has a well-known legal meaning. It signifies:

"A separate obligation attached to any contract to guarantee its performance." Bouvier's Law Dict.

"Security for the fulfilment of a contract or pecuniary obligation, in addition to the principal security." Worcester's Dict.

"In its common use, means additional, subsidiary security given to secure the principal obligation. It is a separate obligation. Such 'collateral security'

stands by the side of the principal promise as an additional or cumulative means for securing the payment of the debt. The etymology of 'collateral' security indicates that it is something running along with, and, as it were, parallel to, something else of a similar character. It is collateral to the original indebtedness." *Moffatt* v. *Corning,* 14 Colo. 104 (24 Pac. 7).

In *National Park Bank* v. *Koehler,* 204 N. Y. 174 (97 N. E. 468), under similar statutory provisions it was sought to hold the indorser on a past due protested note under an agreement with the principal debtor to "hold the old note, with Mr. Koehler's indorsement, as collateral, until the new notes are paid." Of this the court said in part:

"So far as the protest of the old note is concerned, that fact cannot help out the agreement, if that agreement did operate to suspend the plaintiff's right of action against the maker. * * * Its effect was to preclude plaintiff from maintaining any action upon the note against the maker; for the company could have objected that, under their agreement, it was to be held as collateral until the new notes were paid. Thus the right of action was, necessarily, suspended during the interval. * * * The difficulty is that in this arrangement there was evidenced the intention of the parties to suspend action upon the note until a future day. * * * Within the rule of the authorities, as under the provisions of our negotiable instruments law, we must hold that the agreement of the parties did not distinctly, nor impliedly, reserve the right of the bank to proceed by immediate action against the defendant. * * * If the parties actually had in mind a reservation of the right of action against the defendant; if they intended that the transaction was subject to his consent, it would have been easy to have said so. It may be assumed that the plaintiff believed these conditions to have existed, or its assent would have been refused to the arrangement; but the obligation of such an indorser, as a surety, is *strictissimi juris.* He was entitled to insist that, within the strict application of the rule in such cases, he was released from his obligation by an

agreement of the creditor with the principal debtor, to which he had not consented and extended the latter's time of payment of its indebtedness."

We find no occasion to disturb the conclusions of the trial court, that the right of recourse was not expressly reserved, and by entering into an agreement with the maker of the notes extending time of payment for a definite period of 18 months without the consent of defendant Louis G. Hupp plaintiff discharged him from liability as an indorser.

The judgment is therefore affirmed.

MOORE, C. J., and BROOKE, FELLOWS, STONE, CLARK, BIRD, and SHARPE, JJ., concurred.